The STATE of Ohio, Appellee,

v.

SHEPPARD, Appellant.

[Cite as State v. Sheppard, 164 Ohio App.3d 372, 2005-Ohio-6065.]

Court of Appeals of Ohio,
Fifth District, Stark County.

No. 2004CA00361.

Decided Nov. 14, 2005.

Amy S. Andrews, Assistant Stark County Prosecuting Attorney, for appellee.
William F. McGinnis, for appellant.

HOFFMAN, Judge.

{¶ 1} Defendant-appellant, Brian Sheppard, appeals his conviction and sentence entered by the Stark County Court of Common Pleas on two counts of rape in violation of R.C. 2907.02(A)(1)(b), following a jury trial. Plaintiff-appellee is the state of Ohio.

## STATEMENT OF THE CASE AND FACTS

{¶ 2} On March 9, 2004, the Stark County Grand Jury indicted appellant on two counts of rape and one count of gross sexual imposition. Appellant appeared before the trial court and entered a plea of not guilty to all the charges at his arraignment on May 28, 2004.[1] The trial court appointed Fred Pitinii to serve as counsel for appellant. The case proceeded through the discovery process.

{¶ 3} Appellant filed numerous motions, including a motion to determine the competency of a trial witness, which was filed on June 8, 2004. The trial court conducted a hearing on the motion on June 14, 2004. After the judge, the state, and defense counsel questioned the victim, Caitlin Coburn, the trial court found her to be competent to testify, stating that the girl understood the difference between telling the truth and telling a lie. Although the trial court noted Caitlin's sadness and refusal to answer questions regarding appellant, the trial court found that these factors did not affect her competency.

{¶ 4} On August 12, 2004, the state filed a motion to amend the indictment, changing the original continuous-course-of-conduct dates from "on or about March 4, 2003, to on or about March 25, 2003," to reflect a continuous course of conduct from "on or about March 4, 2003, to on or about April 2, 2003." The matter proceeded to jury trial on August 31, 2004.[2] After hearing all the evidence and deliberations, the jury was unable to reach a verdict, and the trial court declared a mistrial. A second trial commenced on October 27, 2004. The following evidence was adduced at trial.

{¶ 5} Gracie Coburn testified that on April 6, 2003, she was helping her then six-year-old daughter, Caitlin, get dressed after the child had taken a bath, when Caitlin told her mother that appellant had sexually abused her. While Gracie was talking with Caitlin, appellant suddenly appeared behind her (Gracie) and asked, "Is she talking about me?" Gracie immediately instructed appellant to leave the residence. Thereafter, Gracie took Caitlin to the emergency room at Aultman Hospital. Gracie noted that prior to March 2003, Caitlin was "pretty much a normal kid," but, after that time, Caitlin became withdrawn and was not herself.

{¶ 6} Mark Hatcher, an emergency room physician with Aultman Hospital, testified that Gracie Coburn presented Caitlin to the hospital on April 6, 2003, with allegations of sexual abuse. Dr. Hatcher performed a physical examination

---

1. The trial court issued a warrant on the indictment, as appellant's whereabouts were unknown. Appellant was arrested on the warrant on May 20, 2004.

2. At the close of the state's case, appellant made an oral Crim.R. 29 motion for acquittal, which the trial court granted with respect to the gross-sexual-imposition count.

of Caitlin. Dr. Hatcher found redness, swelling, and bruising in the child's vaginal area. Dr. Hatcher opined, to a reasonable degree of medical certainty, that Caitlin's physical injuries were consistent with a child who had been sexually abused. Dr. Hatcher noted that the findings correlated with the history he had been given about the child. The doctor further noted that Caitlin had a bladder infection, but said that that would not cause the vaginal irritation he had observed. Dr. Hatcher and his staff referred Gracie to Akron Children's Hospital and Stark County Child Protective Services.

{¶ 7} Holly Steinbach, an investigative social worker with the Stark County Department of Jobs and Family Services, testified that she has worked in the department's sex-abuse unit for three and a half years, during which time she has investigated between 600 and 700 cases of child sexual abuse. Steinbach was assigned to Caitlin's case on April 7, 2003. On April 9, 2003, Steinbach interviewed Gracie and Caitlin at the department's Advocacy Center. Steinbach recalled that Caitlin did not want to discuss the allegations against appellant. Steinbach recommended that Caitlin be taken to Northeast Ohio Behavioral Health for a sex-abuse evaluation. Steinbach also scheduled an appointment for Caitlin at the Children at Risk Evaluation Center ("CARE Center") for a follow-up medical examination.

{¶ 8} Following the interview with Caitlin and her mother, Steinbach attempted to locate appellant. She spoke with Deborah Blacklin, appellant's mother, and Arlie Wally, Blacklin's paramour. Although she was unable to locate appellant, Steinbach learned that appellant had left the state of Ohio.

{¶ 9} On April 15, 2003, Donna Abbott, a nurse practitioner with the CARE Center of Akron Children's Hospital, conducted a sexual-abuse evaluation of Caitlin. As part of her medical evaluation, Abbott obtained a history of Caitlin from Gracie Coburn. Using a colposcope, a magnifying device, Abbott conducted a physical examination of Caitlin's genital area. The examination revealed that Caitlin's genital area was extremely red and excoriated, an irritation that causes the top surface of skin to rub away. Abbott testified that the redness in Caitlin's vaginal area was most likely caused by some source of skin irritation and concluded that Caitlin's disclosure and the circumstances surrounding it were consistent with a child who had been sexually abused. Abbott further explained that the absence of physical findings of sexual abuse was not unusual, as any physical damage to the area could heal in as little as two or three days.

{¶ 10} Caitlin Coburn, who was eight years old at the time of trial, recalled talking to her first-grade teacher, Mrs. Schrock, one day in the school library "because something bad happened." Caitlin testified that she could not remember what she had told Mrs. Schrock, but stated that it was about "[t]his guy." Caitlin explained that appellant had lived with her family, but no longer did

"because of [sic] something bad happened." Caitlin acknowledged that the bad thing that had happened had happened to her. When asked who had done it, Caitlin replied, "Him." Caitlin added that her mother had taken her to see the doctor because something bad happened. Caitlin stated that the doctor looked at her "privacy," which she explained was the part of her body she uses to urinate. When asked why the doctor had to look at her "privacy," Caitlin responded, "[B]ecause this guy did something bad to me." The prosecutor asked Caitlin who had done something bad to her, to which she responded, "Brian."

{¶ 11} Caitlin would not respond to the prosecutor's inquiry as to what bad things appellant had done to her. She did, however, testify that the bad things had happened at her house, on a couch in the living room, while her siblings were sleeping and her mother was working, and that the bad thing had happened more than once. Caitlin recalled that her underpants and pants had been halfway down, as were appellant's pants and underpants. Caitlin told the prosecutor that her mother was the first person she had told of the incident, and she also had told a teacher and Aimee Thomas, a counselor. During one of her sessions with Aimee Thomas, Caitlin drew a picture of appellant's "privacy." When asked at trial, "What did you tell [Thomas] about [appellant]?" Caitlin stated, "What happened." Caitlin would not, however, answer the follow-up question "What did happen?" Caitlin also would not tell how she knew what appellant's "privacy" looked like.

{¶ 12} Aimee Thomas, a licensed professional clinical counselor with Northeast Ohio Behavioral Health, testified that she had conducted a sexual-abuse evaluation of Caitlin Coburn.[3] The purpose of Thomas's assessment was to determine whether Caitlin had any mental-health disorders, to provide treatment recommendations if needed, and to determine the nature and extent of the sexual-abuse allegations. Thomas obtained a history from Gracie Coburn, and learned that prior to the abuse, Caitlin was a well-behaved child and a good student. After the abuse, Caitlin's behavior changed dramatically. Caitlin expressed anger, had a defiant attitude, and repeatedly expressed a desire to die. Caitlin also refused to sleep in her own bed, worrying that appellant would come and steal her or stab her. Thomas described Caitlin as spontaneous and emotional.

{¶ 13} During the first session, Thomas asked Caitlin why she came to see Thomas. Caitlin spontaneously replied that appellant had put his "privacy" in her "privacy." Caitlin identified both male and female genitalia as "privacy." Caitlin told Thomas that her mother began working evenings at Taco Bell in the spring of 2003. While her mother worked, appellant babysat Caitlin and her

---

3. Aimee Thomas was working as a psychology assistant at Northeast Ohio Behavioral Health while she was completing her Ph.D. in counseling psychology.

siblings. After appellant put the siblings to bed, he would take Caitlin into the living room. Thomas testified that Caitlin had described appellant's actions, pulling his pants down, pulling Caitlin's pants down, kissing Caitlin with his tongue, and licking her "privacy" with his tongue. Thomas added that Caitlin had also detailed how appellant had placed her, bow-legged, on top of his "privacy" and put his "privacy" into her "privacy." Caitlin also told Thomas that appellant had made her rub his penis and placed his penis in her mouth. Thomas recalled that Caitlin had become visibly upset while disclosing these events, telling Thomas that she hated what appellant had done to her and was so angry that she wanted to kill herself. Thomas testified that Caitlin had a difficult time explaining what appellant had done to her, but was able to demonstrate appellant's actions, using anatomically correct dolls. Caitlin also drew pictures of appellant and appellant's "privacy." Thomas recalled that when she presented Caitlin with a picture of a naked male, Caitlin tore up the picture.

{¶ 14} Thomas concluded that Caitlin's behavior was consistent with that of a child who had been sexually abused. Thomas based her conclusion upon Caitlin's emotional presentation, Caitlin's knowledge of sexual details which were not appropriate for a child of her age, her consistency in relating the details of the abuse, and the behavioral disorders Caitlin subsequently experienced, which were consistent with a child who had experienced a trauma.

{¶ 15} The last witness called in the state's case-in-chief was Katherine Schrock, a first grade teacher in the Canton City School System. Schrock testified that Caitlin was in her class during the 2002–2003 school year. Schrock recalled that on April 14, 2003, Caitlin initiated a conversation with her, which resulted in Schrock's calling the Children's Hotline. After the conversation, Schrock noticed a change in Caitlin's school performance as well as her personality.

{¶ 16} Upon completion of Schrock's testimony, the state rested its case. Appellant made an oral motion for acquittal pursuant to Crim.R. 29, which the trial court overruled. Appellant presented three witnesses and testified on his own behalf. At the close of his case, appellant again made an oral motion for acquittal, which the trial court overruled. The parties presented their closing statements. The trial court instructed the jury on the applicable law, including an instruction on flight. After hearing all the evidence and deliberations, the jury found appellant guilty of two counts of rape. The jury made additional findings relative to each count regarding Caitlin's age at the time of the sexual conduct. The trial court scheduled a sentencing and classification hearing for November 1, 2004.

{¶ 17} At the November 1, 2004 hearing, appellant stipulated to a classification as a sexual predator. The trial court sentenced appellant to two concurrent prison terms of life without the possibility of parole.

{¶ 18} It is from this conviction and sentence that appellant appeals, raising the following assignments of error:

{¶ 19} "I. The appellant was denied his right to a fair trial by the admission of testimonial hearsay evidence in violation of his Sixth Amendment right to confrontation.

{¶ 20} "II. Appellant was denied his right to a fair trial by errors committed by the trial court.

{¶ 21} "III. Appellant was denied his right to a fair trial by the misconduct of the prosecuting attorney.

{¶ 22} "IV. Appellant was denied his right to a fair trial as a result of ineffective assistance of counsel."

I

{¶ 23} In his first assignment of error, appellant maintains that he was denied his right to a fair trial as a result of the trial court's admission of testimonial hearsay evidence in violation of his Sixth Amendment right to confront witnesses. Specifically, appellant challenges the testimony of Aimee Thomas, the psychologist who evaluated Caitlin and testified regarding the child's disclosures to her.

{¶ 24} Appellant argues that Caitlin's statements were "testimonial" within the contemplation of the United States Supreme Court's recent decision in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and, thus, violated his constitutional right to confront witnesses and to due process. We disagree.

{¶ 25} In *Crawford,* the United States Supreme Court held:

{¶ 26} "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v. [Roberts]* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 27} Although the threshold determination becomes whether the hearsay statements in question are "testimonial," the *Crawford* court explicitly declined to

provide a comprehensive definition of "testimonial." It did, however, provide three formulations of the core class of testimonial statements.

{¶ 28} "In the first, testimonial statements consist of 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' [*Crawford,* 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177.] The second formulation described testimonial statements as consisting of 'extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Id. at 52–53, 124 S.Ct. 1354, 158 L.Ed.2d 177.] Finally, the third explained that testimonial statements are those 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' [Id. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177.] While the [*Crawford*] Court declined to settle on a single formulation, it noted that, '[w]hatever else the term [testimonial] covers, it applies . . . to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. These are the modern [practices with closest kinship to the] abuses at which the Confrontation Clause was directed.' [Id. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.]" *Horton v. Allen* (C.A.1, 2004), 370 F.3d 75, 84.

{¶ 29} Additionally, the Sixth Circuit has adopted a test to determine whether statements are testimonial for purposes of the Sixth Amendment. *United States v. Cromer* (C.A.6, 2004), 389 F.3d 662. In *Cromer,* the Sixth Circuit held that statements are testimonial if they are " 'made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime.' " Id. at 673, quoting Richard D. Friedman & Bridget McCormack, Dial–In Testimony (2002), 150 U.Pa.L.Rev. 1171, 1240–1241.

■ {¶ 30} Applying the aforementioned, we conclude that Caitlin's statement was nontestimonial. Initially, we note that Thomas's testimony falls within the hearsay exception provided in Evid.R. 803(4), statements for purposes of medical diagnosis or treatments. Thomas specifically testified that the purpose of her evaluation of Caitlin was to diagnose any mental-health disorders, to provide treatment recommendations, and to determine the nature and extent of the allegations of sexual abuse. Statements by victims of child abuse by medical providers have been found to be nontestimonial. *State v. Lee,* Summit App. No. 22262, 2005-Ohio-996, 2005 WL 544837; *In re D.L.,* Cuyahoga App. No. 84643, 2005-Ohio-2320, 2005 WL 1119809. We further find that there is no record evidence to establish that Caitlin realized that the statements she made to Thomas would be used in the prosecution of a criminal trial.

■ {¶ 31} Assuming arguendo that Caitlin's statements were testimonial, we find that the trial court properly allowed the testimony. "]W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9. Accordingly, we find that appellant was not denied a fair trial.

{¶ 32} Appellant's first assignment of error is overruled.

## II

■ {¶ 33} In his second assignment of error, appellant claims that he was denied a fair trial as a result of errors committed by the trial court. Specifically, appellant maintains that the trial court erred in admitting the hearsay testimony of Aimee Thomas regarding Caitlin's disclosures without conducting a voir dire for trustworthiness as required by Evid.R. 807(A)(4). Additionally, appellant submits that the trial court erred in instructing the jury on "flight." We shall address each argument in turn.

{¶ 34} A trial court has broad discretion to determine whether a declaration falls into a hearsay exception. *State v. Rohdes* (1986), 23 Ohio St.3d 225, 229, 23 OBR 382, 492 N.E.2d 430. Therefore, we will not disturb a trial court's evidentiary ruling unless we find that the court abused its discretion, i.e., an unreasonable, arbitrary, or unconscionable ruling. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 35} Thomas's testimony concerning Caitlin's statements was admitted under Evid.R. 803(4), which allows the admission of statements made in order to further medical treatment or diagnosis. Such statements are assumed to be reliable, since the effectiveness of treatment often depends upon the accuracy of the information related. *State v. Boston* (1989), 46 Ohio St.3d 108, 121, 545 N.E.2d 1220. However, recognizing that a patient who is a young child may not understand the need to be truthful to medical personnel, the Ohio Supreme Court in *State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436, recommended that in the case of young children, trial courts consider the circumstances surrounding the making of statements to a medical professional before admitting those statements under Evid.R. 803(4). A trial court should exclude testimony under the *Dever* test only in cases where there is affirmative evidence of improper motivation. Id. at 405–409, 596 N.E.2d 436.

{¶ 36} In the instant action, the trial court did not specifically conduct a voir dire of Caitlin to determine whether her statements to Aimee Thomas were unduly influenced or the product of improper motivation. However, this court has previously found that the failure to conduct such a voir dire, while not

desirable, is not fatal to the admissibility of evidence under Evid.R. 803(4), if the medical professionals and child are available for cross-examination. *State v. Crum* (Oct. 26, 1998), Stark App. No. 97–CA–0134, 1998 WL 818055; *State v. Kelly* (1994), 93 Ohio App.3d 257, 638 N.E.2d 153. Appellant's trial counsel cross-examined Caitlin and Thomas. Counsel specifically questioned Thomas regarding any undue influence that might have been exercised over the girl. Accordingly, we find no error in the trial court's admission of the testimony.

{¶ 37} We now turn to appellant's assertion that the trial court erred in instructing the jury on flight. Appellant did not object to the instruction at trial.

{¶ 38} "Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal." *State v. Underwood* (1983), 3 Ohio St.3d 12, 13, 3 OBR 360, 444 N.E.2d 1332. Further, "a jury instruction which improperly places the burden of proof upon a defendant 'does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise'." Id. at 14, 3 OBR 360, 444 N.E.2d 1332, quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 39} We find no evidence that would suggest that the outcome of the trial would have been different had the trial court not instructed the jury on flight. The specific instruction provided as follows:

{¶ 40} "In this case there is evidence that the Defendant may have fled from justice. You may not presume the Defendant guilty from this evidence. You may, however, infer a consciousness of guilt regarding the evidence of the Defendant's alleged flight. An accused's flight and related conduct may be considered as evidence of consciousness of guilt and, thus, of guilt itself."

{¶ 41} Ohio courts have routinely approved similar instructions. *State v. Goodbread*, Butler App. No. CA–2003–02–038, 2004-Ohio-419, 2004 WL 192800; *State v. Taylor* (1997), 78 Ohio St.3d 15, 27, 676 N.E.2d 82.

{¶ 42} In the instant action, there was sufficient evidence presented to support the trial court's decision to give a flight instruction. Upon learning of the incidents, Gracie Coburn ordered appellant to leave the residence. Days later, when Holly Steinbach attempted to locate appellant, she learned he had left the state. The jury was free to weigh this evidence in any manner it deemed appropriate. Under these circumstances, we find that the trial court did not abuse its discretion in instructing the jury on flight.

{¶ 43} Appellant's second assignment of error is overruled.

## III

{¶ 44} In his third assignment of error, appellant submits that he was denied a fair trial as a result of prosecutorial misconduct. Specifically, appellant challenges the prosecutor's closing argument with respect to the evidence of flight, alleging that the argument was "flawed and misleading."

{¶ 45} "The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. *State v. Lott* (1990), 51 Ohio St.3d 160 [555 N.E.2d 293], certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144. A trial is not unfair, if, in the context of the entire trial, it appears clear beyond a reasonable doubt the jury would have found the defendant guilty even without the improper comments. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464 [739 N.E.2d 749]." *State v. Rogers*, 5th Dist. No. 2005CA00055, 2005-Ohio-4958, 2005 WL 2300293, ¶ 42.

{¶ 46} Assuming, arguendo, that the prosecutor's statements were improper, we find appellant's substantial rights were not prejudicially affected, because (1) the trial court instructed the jury that closing arguments were not evidence and (2) the evidence of appellant's guilt presented at trial was strong.

{¶ 47} Appellant's third assignment of error is overruled.

## IV

{¶ 48} In his final assignment of error, appellant claims that he was denied the effective assistance of counsel.

{¶ 49} The standard of review of an ineffective-assistance-of-counsel claim is well established. Pursuant to *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that in the absence of those errors, the result of the trial court would have been different. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 50} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Id. at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in

any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id. at 142, 538 N.E.2d 373.

{¶ 51} In order to warrant a reversal, the appellant must additionally show that he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at paragraph three of the syllabus. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

{¶ 52} The United States Supreme Court and the Ohio Supreme Court have held that a reviewing court " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " Id. at 143, 538 N.E.2d 373, quoting *Strickland* at 697, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accordingly, we will direct our attention to the second prong of the *Strickland* test.

{¶ 53} Appellant specifically contends that he was denied effective assistance of counsel based upon (1) "trial counsel's failure to object to the testimony of the medical professionals relative to the history of the allegations provided by Gracie Coburn" and (2) "trial counsel's failure to object to the trial court's instruction on flight."

{¶ 54} Having found that the trial court did not err in its admission of the testimony at issue and did not err in instructing the jury on flight, we find that appellant is unable to satisfy the second prong of the *Strickland* test.

{¶ 55} Appellant's forth assignment of error is overruled.

{¶ 56} The judgment of the Stark County Court of Common Pleas is affirmed.

Judgment affirmed.

BOGGINS, P.J., and EDWARDS, J., concur.